SCOTT *et al.* v. THE CITY OF DES MOINES.

THE CITY OF DES MOINES v. FARR *et al.*

1. **Corporation municipal: BRIDGES: CONTRACT.** Persons owning a toll bridge, for a consideration conveyed it and the franchise relating thereto, to a city, stipulating in the conveyance, that it was "to be held in trust by said city for the use of the public." *Held,* that the acceptance of such conveyance and trust did not in itself impose upon the city the duty of keeping the bridge in repair as a free bridge.

2. —— And such bridge being in a dilapidated and unsafe condition, the city, in the exercise of its authority for the protection of the public, might properly remove it, and construct in its place or near to it, a new bridge, and charge tolls for the use of the same.

3. —— The fact that other corporations, or persons, contributed to the erection of the old bridge would not change the rule.

*Appeals from orders of Hon. H. W. Maxwell, Judge of the Fifth Judicial District.*

THURSDAY, JULY 25.

THESE cases, as they involve the same legal questions, and present the same facts, are submitted together. In the first case an injunction was allowed, in the second an injunction was refused upon the petition of the city against the same parties who are plaintiffs in the other case. The city appeals in both cases. The facts appear in the opinion.

*W. H. McHenry, Barcroft & Hammond* for the appellant.

*Polk & Goode* for the appellee.

BECK, Ch. J. — On the 7th day of June, 1861, the supervisors of Polk county granted a license to one M. P. Turner, to erect and maintain a toll bridge across the

Raccoon river, within the present corporate limits of the city of Des Moines. The authority so granted was to continue for twenty years. The bridge was completed in 1862, and maintained by Turner and associate as a toll bridge until 1868, when they conveyed it, together with their franchise, to the city of Des Moines. The conveyance is in the following language: "Know all men by these presents, that we, M. P. Turner and U. B. White, of, etc., in consideration of the sum of $2,500 in hand paid, do hereby sell and convey unto the city of Des Moines, Polk county, and State of Iowa, the bridge across the Raccoon river near its mouth, in said city, and the charter and franchise obtained by M. P. Turner for running the same as a toll bridge, said property to be held in trust by said city for the use of the public; and all the right of way deeded to us by C. C. Van, in South Fort, Des Moines, Iowa, and we do hereby covenant to warrant and defend the title to said premises," etc. This conveyance was executed June 27, 1868. On the 4th of June, 1868, the county of Polk appropriated the sum of $5,000 for the purpose of making the bridge free, on condition that it, together with the franchise, should be conveyed to the city of Des Moines "for the free use and benefit of the public." On the 8th of June, 1868, the city of Des Moines, by ordinance, appropriated $2,500 "for the purpose of aiding in the purchase of the bridge, and making the same free to the public." The plaintiffs in the first suit and defendants in the second, with others who were alike interested, contributed nearly $2,500 for the purchase of the property with the design that it should become thereby free to the public.

The appropriation made by the county and city respectively, was not on condition of a like appropriation to be made by the other corporation, or of contributions to be made by other parties, so far as appears by their recorded acts. The contributions from plaintiffs and others were

Vol. XXXIV. —

raised by the solicitations of Turner and White, who, upon receiving them, executed to each party making payment thereof, an agreement that, in case the bridge should not be made free, he should pass the same with his teams and family free of charge, so long as it remained a toll bridge. The city, before the commencement of these suits, commenced the erection of another bridge very near the one in question, which has since been completed. The new bridge is so constructed, and the approaches are necessarily at such a grade as to interfere with, if not entirely prevent, the use of the old one. Since the completion of the new bridge, the city, or certain persons acting for it, have torn up the floor of the old one so as to render its use impossible. The new bridge was exclusively built by the city, and is a *toll* bridge, and is to be maintained as such, and the same charges are demanded of plaintiffs as of other persons who cross it. The foregoing are undisputed facts. It is shown, we think, by the great preponderance of the evidence, that the old bridge, which was not at the first well built, has become unsafe, and is not a sufficient structure for the purpose for which it is used. The piers have settled so as to throw it out of line; some of the timbers are are broken, others are rotten or defective; it is shown, in short, not to be a safe bridge for public travel. So defective had it become that the city employed a man to watch it and warn passengers of the proper way of crossing it, to avoid danger, as far as possible, and to prevent teams, in numbers beyond its strength, attempting to pass over it at the same time. The cost of repairing the bridge and putting it in a condition safe for travel, it is shown by the evidence, would have been very great, and could only be done by rebuilding it.

The foregoing are all the facts which are necessary to be considered in determining the legal questions presented. The statement of others found in the record will not be attempted.

In the first case the petition prays that a preliminary injunction be allowed, which upon the final hearing may be made perpetual, restraining the city from collecting toll from the plaintiffs for the use of the new bridge, and from obstructing in any manner the use of the old bridge, and from injuring, removing or pulling it down. It also asks, that the defendant, by proper order, be required to put the old bridge in good repair for public use, and in default thereof that petitioners be allowed to use the new one without payment of toll.

In the second case the city shows in its petition that defendants, who are plaintiffs in the first case, have replaced the floor of the old bridge, before taken up under authority of the city, and are threatening to remove the approaches to the new one, which will render it inaccessible. The petition prays that the defendants be restrained from repairing the old bridge, or in any way interfering with the city's control thereof, or its right to close the same for public travel.

The facts above set out were shown either by the pleadings of the parties or by evidence submitted upon the application for the injunctions in the respective cases. In the first case the injunction as prayed for was allowed, except that the city was not required to repair the old bridge. It was ordered, however, to remove the obstructions thereto caused by the approaches to the new one.

From the order in each case, the city appeals. The cases are presented together in a single record. They present the same facts, and involve the same questions of law. These questions we will now proceed to consider.

I. It is unnecessary to inquire into the validity of the license originally issued to Turner for the old bridge; we will regard it, for the purposes of these cases, as valid. What rights were acquired by the city by the conveyance to it of that bridge and the franchise held by Turner and White? It cannot be doubted that the city acquired the

legal title to the bridge and franchise. This, it appears, is not disputed by the counsel opposed to the city, and by those whom they represent, who, for convenience, we will hereafter call plaintiffs. But, they insist, the city holds the bridge in trust for them and the public generally. That the trust is created by the express words of the conveyance to the city so far as the public is concerned, and by the fact, as to plaintiffs, of their payment, with the knowledge of the city, of a portion of the purchase-money for the bridge and franchise. We are prepared to admit this position, that as to plaintiffs and the public generally, the city is a trustee holding the bridge for their use. It becomes necessary to inquire into the obligations and duties imposed upon the city by the existence of this trust. We find nothing in the record supporting the view that the city assumed or is charged with the duty of keeping the bridge in repair as a free bridge. The mere acceptance of the trust, without more, would not impose upon it that burden. There should be shown to exist some contract, either expressed or implied, to that effect, to which the city is a party, to justify that conclusion. But nothing of the kind is found. The case is simply this: The county appropriates $5,000, the city $2,500, and certain private parties contribute about $2,500, to purchase the bridge and franchise, to be held by the city in trust for the public. No provision is made binding any one of these parties to keep the bridge in repair. Certainly the city is not bound to do so, under this arrangement. We speak now only of its obligation under the trust created by the acts of the parties and not of the duty of the city as created by law.

The bridge has become unsafe and unfit for use. The city cannot be required to repair it or to build a new one to take its place. The plaintiffs and the county, or either of these parties, do not propose to do this, but the plaintiffs seek to require the city to repair the bridge and compel it to permit the structure to remain standing. The bridge

being unsafe, it ought not to be suffered to stand, endangering the lives and property of travelers. The city, in the exercise of its authority, and for the protection of the public, may very properly remove it.

II. We will, for a moment, consider the duty and obligations of the city in regard to the bridge, as regulated by law. It has the care, supervision and control of highways and bridges within its limits, and shall cause the same to be kept open and in repair. Acts thirteenth General Assembly, chapter 179. It is authorized, under chapter 84, acts of the same General Assembly, to build and maintain toll bridges. Under the authority conferred by these enactments it may, unquestionably, erect and maintain either free or toll bridges. In either case it is required to keep them open for public travel, and in such repair as to secure the safety of those using them. It cannot be doubted that it rests in the option and discretion of the city to determine whether a bridge shall be free or "*toll.*" It is equally plain that it may, at its option, change a toll bridge into a free bridge, and, should there exist no intervening rights of other parties, may convert a free bridge into a toll bridge. In case a structure of either character becomes worn out or unfit for use, the corporation may erect a new one in its place, and may determine whether it shall be free to the public, or its use be conditioned upon the payment of tolls. And this was done by the city in the case before us. After the old free bridge in question became unsafe for public travel, it erected in its place a new one, for the use of which toll is to be paid.

The fact that other corporations or persons contributed to the erection of the first bridge does not affect the authority of the city touching the same. Such contributions did not have the effect to deprive the corporation of its power, or take away its rights and duties in the care, supervision and control of the bridge. These contributions were voluntary, and, as we have seen, were not made

under a contract with the city, whereby it assumed obligations different from those imposed by law. The city, by receiving them, abrogated none of her powers, and was deprived of none of her rights. Being made for the purchase of private property to be devoted to public use, the contributors acquired no interest in the property different from that possessed by the public generally. The city acquired the same authority and control over the bridge as though it had been purchased wholly with its own funds.

III. Plaintiffs claim rights because of their contribution to purchase the bridge franchise of Turner & White, insisting that they became vested with an interest therein, and for that reason the bridge should be kept open for the use of themselves and the public free of charge.

The franchise purchased by the city was a right to charge toll for the use of the bridge. If that franchise exists in the city or in plaintiffs now, they possess the same right. It is, indeed, difficult to see how the ownership of that franchise, though held in trust for plaintiffs, would obligate the city to maintain the structure as a free bridge. If the franchise exists, and is held by the city, it will authorize the collection of tolls. This seems to be clear. It may be true, that if plaintiffs are interested therein they may claim their share of the receipts from that source. But they make no such claim, insisting that the bridge is free, and ought to be maintained as such by the city.

But, in our opinion, the purchase by the city extinguished the franchise. It was made for that purpose; the appropriations by the city and county and the contributions of plaintiffs were upon condition that the bridge should be free. If the franchise existed after the purchase, the right to collect toll also existed; but the object of the purchase being to extinguish this right, was accomplished by the consummation of the transaction. The franchise, therefore,

became extinguished by the purchase. This is an indisputable conclusion.

There are other questions presented in the arguments of counsel of the respective parties, which we find unnecessary to be determined, as our conclusions above announced are decisive of the case.

In our opinion, the judge of the district court erred in the order made in each case. The injunction should have been refused in the first and allowed in the last. The decisions in both cases are, therefore,

Reversed.